THE STATE v. AVERY, *Appellant.*

Division Two, January 31, 1893.

1. **Criminal Practice**: CROSS-EXAMINATION OF DEFENDANT. Defendant who was charged with murder testified that he and deceased were lying at night on some hay when the latter borrowed defendant's pistol and immediately shot himself. *Held,* that in order to ascertain defendant's opportunities for observing the acts and movements of deceased, it was proper to ask defendant on cross-examination if the moon was shining.

2. ——: ——. On cross-examination defendant was asked concerning a conversation he had with another as to how the deceased came to his death; his answers were confirmatory of his statements in chief and were not contradicted. *Held,* that defendant was not prejudiced.

3. ——: ——. Where on such trial a witness for the state testified that he had heard defendant say that it was a man by the name of T. who traveled with him towards the place where the deceased's body was found, it was proper under Revised Statutes, 1889, section 4218, restricting the cross-examination to matters embraced in the examination in chief, to cross-examine the defendant as to the statement for the purpose of showing that T. and deceased were the same person.

4. ——: ——. Such evidence was also competent for the purpose of laying the foundation to contradict defendant.

5    **Criminal Law** : MURDER IN FIRST DEGREE: INSTRUCTIONS. The court instructed that if the jury believed that "defendant shot and killed deceased for the purpose of robbing him of his property then such shooting and killing were done wilfully, deliberately and premeditately and of malice aforethought. *Held*, not erroneous because it assumes that defendant killed deceased for the purpose of robbing him.

6.    ——: ——: ——. An instruction on circumstantial evidence approved.

7.    ——: ——. It is not error in a trial for murder in the first degree for the court to instruct the jury that, if they find the defendant guilty of that offense, they have nothing to do with assessing the punishment as that is fixed by law.

8.    **Criminal Practice** : SEPARATION OF JURORS: STATUTE. Under Revised Statutes, 1879, section 1909 (Revised Statutes, 1889, section 4209), which provides that with the consent of the prosecuting attorney and defendant the court may permit the jury to separate at any adjournment or recess of the court during the trial in all cases except in capital cases," a separation occurring during a trial for murder in the first degree will not constitute a ground for a new trial when it is made affirmatively to appear on the part of the state that the jurors were not subject to improper influences.

9.    **Supreme Court Practice** : EVIDENCE: BILL OF EXCEPTIONS. Alleged error of the court in admitting documentary evidence will not be reviewed where such evidence does not appear in the bill of exceptions.

10.    ——: IMPROPER REMARKS OF PROSECUTING ATTORNEY: BILL OF EXCEPTIONS. Nor will alleged improper remarks of the prosecuting attorney be reviewed where they are not set out in the bill of exceptions.

*Appeal from Barton Circuit Court.*—HON. D. P. STRATTON, Judge.

AFFIRMED.

*Cole & Ditty* for appellant.

(1) The court erred in permitting a cross-examination of defendant concerning matters not referred to in his examination in chief, and when he had claimed his privilege under the law of not being compelled to testify against himself. Constitution, art. 2, sec. 23; Revised

Statutes, 1889, sec. 4218; *State v. McGraw*, 74 Mo. 573; *State v. McLaughlin*, 76 Mo. 321; *State v. Turner*, 76 Mo. 350; *State v. Patterson*, 88 Mo. 88; *State v. Bulla*, 89 Mo. 595; *State v. Chamberlain*, 89 Mo. 129; *State v. West*, 95 Mo. 143.   (2) The law will not permit the utter disregard of its mandate prohibiting the separation of the jury in capital cases such as is shown in this case.   *State v. Collins*, 81 Mo. 652; *State v. Murry*, 91 Mo. 100; *State v. Witten*, 100 Mo. 525; *State v. Gray*, 100 Mo. 523; *Kelley v. State*, 12 S. W. Rep. (Tex.) 505; *McLean v. State*, 8 Mo. 153.   (3) A new trial should have been granted the defendant on the eighteenth ground of motion for a new trial.   It was for the jury to say whether the defendant was a "red handed murderer," not the prosecuting attorney, and further, punishment provided by law is inflicted for violation of the law, not for public policy.   *State v Jackson*, 95· Mo. 653; *State v. Kring*, 64 Mo. 591; 1 Thompson on Trials, secs. 965, 966.   (4) When the state offered the affidavit of ̗Jacob Beam, one of the jurors, in rebuttal, on the hearing of the motion for new trial, then the defendant had a right to put him on the stand and show the whole truth touching the matters referred to in his affidavit by cross-examination.   1 Thompson on Trials, sec. 405.   (5) The instruction number 4, given at instance of the state, contains error.   It assumes that there was evidence that James A. Miles "was shot and killed for the purpose of robbing him of his property."   No such assumption is allowed.   2 Thompson on Trials, sec. 2290; *State v. Bell*, 70 Mo. 634.   (6) Instruction number 5, given at instance of the state, is erroneous in this, that it does not require the "circumstances from which the jury may infer other connected facts," shall be established beyond a reasonable doubt, nor by a preponderance of the testimony, nor to any degree of

conclusiveness. Under this instruction if any of these circumstances have been testified about then such circumstances become a basis for inferring other facts. 2 Thompson on Trials, sec. 2511. The instruction is a comment upon the evidence, and for that reason is erroneous. Revised Statutes, 1889, sec. 4220; *State v. Hundley*, 46 Mo. 421; *State v. Smith*, 53 Mo. 267; *State v. Jones*, 61 Mo. 232; *State v. Elkins*, 63 Mo. 159; 2 Thompson on Trials, sec. 2420. (7) Instruction number 7 is gross error. It is a bid for a verdict of murder in the first degree and contains the assurance that if the bid is accepted the jury will be entirely exonerated from responsibility as to the gravity of the results. (8) It was error to admit the papers, exhibits "K" and "L" purporting to show "proceedings" of a Kansas court. (9) The evidence of defendant justified an instruction submitting the question as to whether J. A. Miles committed self-murder, and was aided and abetted in the act by defendant. The instruction asked by the defendant should have been given, as requested. *State v. Ludwig*, 70 Mo. 432; 1 Revised Statutes, 1889, sec. 3566; *State v. Douglass*, 81 Mo 236; *State v. Banks*, 73 Mo. 592; *State v. Tate*, 12 Mo. App. 329; *State v. Partlow*, 90 Mo. 608.

*R. F. Walker*, Attorney General, and *C. S. Essex*, Prosecuting Attorney, for the State.

(1) Under the act of 1877, before amendment in 1879, a defendant testifying was subject to the same rules and tests as any other witness, and might be contradicted and impeached in the same manner as any other witness in the case. *State v. Clinton*, 67 Mo. 391; *State v. Cox*, 67 Mo. 392. Under the present law (Revised Statutes, 1889, sec. 4218) the rule is the same, except that the cross-examination is limited to

matters "referred to" in direct examination, and he may still be "contradicted and impeached as any other witness in the case" by express terms of the statute. *State v. Rider*, 90 Mo. 54; *People v. Mullings*, 83 Cal. 138; *State v. Walker*, 98 Mo. 114; *State v. West*, 95 Mo. 139; *State v. Young*, 99 Mo. 681.   (2) The alleged separation of the jurors took place before the trial was concluded and the state assumed the burden of showing by the counter-affidavits of the officers and jurors that the jury was not thereby subjected to any improper influence, and there is nothing to complain of. Thompson & Merriam on Juries, secs. 310, 318 (subdiv. 6), 319, 320, 321, 328; 1 Bishop on Criminal Procedure, secs. 994, 995; *State v. Collins*, 86 Mo. 245; *State v. Washburn*, 91 Mo. 571; *State v. Rush*, 95 Mo. 199; *State v. Crawford*, 99 Mo. 74; *State v. Orrick*, 106 Mo. 124; *State v. Steifel*, 106 Mo. 129; *State v. Cucuel*, 31 N. J. L. 249.   (3) The remarks made by the prosecuting attorney do not constitute reversible error.   *State v. Forsythe*, 89 Mo. 667; *State v. Griffin*, 87 Mo. 608.   (4) A juror will not be permitted to impeach his own verdict either on direct or cross-examination, but may depose or testify in support of it.   *State v. Rush*, 95 Mo. 205; *State v. Branstetter*, 65 Mo. 156; *State v. Underwood*, 57 Mo. 51; Thompson & Merriam on Juries, sec. 340, pp. 398–9.   (5) The instructions properly declared the law.   *State v. Hopkirk*, 84 Mo. 287; *State v. Payton*, 90 Mo. 227; *State v. Anderson*, 98 Mo. 473.   (6) The certified copies of defendant's plea of guilty to the charge of burglary and larceny in the Kansas district court are not called for in the bill of exceptions, are not in the record, and hence not subject to review in this court.   The presumption is that they were rightfully admitted.   But if they were preserved, they are in due form and properly authenticated.   Act of Congress, 2 Revised Statutes,

1889, sec. 905, p. 2168; 1 Revised Statutes, 1889, sec. 4881; *Grover v. Grover*, 30 Mo. 400. And the records and judicial proceedings were properly admitted for the purpose of impeachment, and the judgment of conviction was the only competent evidence. *State v. Miller,* 100 Mo. 622; *State v. Howard*, 102 Mo. 149; 1 Thompson on Trials, sec. 535, and note 6.

BURGESS, J.—At the February term, 1892, of the circuit court of Barton county, the appellant, Amos Avery, was indicted for murder in the first degree, for the killing of one James A. Miles in said county on the twenty-second day of September, 1891. He was put upon his trial at the September term of said court and convicted of murder of the first degree. The indictment is in the usual form for murder in the first degree and no point is made on it in this court.

The evidence introduced by the state established the following facts:

About the seventeenth of August, 1891, James A. Miles, the young man alleged to have been murdered, together with J. B. Highfill and James Griffin, two other young men, left their homes in Prairie county, Arkansas to canvass overland for a photograph family album, published by Corry & Co., of Chicago. They were to work under one W. M. Lively, of Rosebud, Arkansas, who was the general agent of the company. Each had his separate outfit—a horse, cart, samples, instructions, etc. Young Miles was about twenty-one years of age, light, sandy complexion, blue eyes, medium size; his left hand had been mangled in a cotton-gin about two years previous—three fingers and thumb gone, a stub of the forefinger remaining, and balance of hand badly mangled, being useless; had never travelled from home much; was dressed in a light colored suit. The horse was a faded black, dark

brown, or what some witnesses called sun-burnt black; about fifteen and one-half hands high; from five to nine years old; probable weight one thousand pounds; had kind of "racking" walk when started up, described as a "wiggler;" had a scar or blemish on outside of left ·hind leg, just below knee, running ·diagonally toward ankle joint, caused by falling through a bridge. The cart was a light red, one spring with seat resting on spring, slats where feet rest. The lower leaf of spring had been broken and replaced by a wider, heavier one. A letter "A" cut in seat under cushion. (The other property and physical evidence alleged to have belonged to deceased was not described for the reason that it was all produced in court, identified and introduced in evidence before the jury.)

The defendant was about twenty years of age, rather tall, very dark, swarthy complexion. Had lived at and around Fort Scott, Kansas, and had also worked in the mines at and around Baxter Springs and Galena, Kansas, and was pretty well known in that country.

The destination of the three young men referred to was Southwest Missouri, where they were to canvass in four counties—Bates, Henry, Johnson and Cass. Their first stopping point was at Lone Oak, in the southeast portion of Bates county. Here they met with indifferent success at canvassing. Highfill and Griffin went to work on farms near Lone Oak. Miles, not being able to do farm work, owing to the loss of ·a hand, continued the work of canvassing until the latter part of September, still without success. On Monday, the twenty-first of September, 1891, at about noon, Miles left Highfill and Griffin at Lone Oak, going southwest, saying he was going by the way of the Indian Nation, and work his way back home, by

picking cotton.   He took with him his horse, cart and harness, his valise containing an extra suit of clothing, shirts, underclothing, etc., also a pistol, and the sample record framed—very little money—going in the direction of the old military road, running south from Fort Scott, Kansas, to the nation.

On Tuesday, the twenty-second day of September (the next day after Miles left Lone Oak), and some time in the morning, the defendant left Fort Scott, Kansas, with a pistol belonging to another man, going south toward Arcadia, Kansas.   Some time between eleven A. M. and noon of that day, Avery, the defendant, stopped at the house of Capt. Daubin, some five or six miles south of Fort Scott on the Arcadia road. (Daubin had known him for a year, defendant having worked for him prior to that time.)   He came there afoot and had the revolver with him.   Said that he didn't want to work; that he had had a difficulty with some "niggers" in Fort Scott the night before and was getting over into Missouri.   He ate dinner there, and about two o'clock P. M., left there afoot going in the direction of Arcadia, which is about twelve miles southeast from Daubin's.

About four o'clock that evening the defendant and Miles appeared together at the house of one Ridge, about eight miles southeast of Daubin's and about four miles northwest of Arcadia—defendant riding in the cart with Miles.   They got a drink, had some conversation with witness Ridge, and left together with the horse and cart going in the direction of Arcadia. · At about supper time the same evening, both men on the cart, they drove into Arcadia on the Fort Scott road, the defendant with a revolver sticking out of his hip pocket.   They drove up to the public well to water and tied the horse; witness noticed that man driving had left hand off.   While at the well defend-

ant had a conversation with witness McCalmet about roads, etc.  Miles went into a bakery in Arcadia, told the baker who he was, where he lived, his business, showed him his crippled hand, said he was trying to work his way back home, that he was out of money, asked for and was given some bread.  Defendant Avery went into the store of witness J. M. Humphrey and asked to buy some crackers on time; said that his name was Smith, that his father lived near there and would be in in the morning, and he would send the money in by him.  Said he had been to Fort Scott, got on a "spree" and was "strapped."  Witness did not know him but gave him the crackers in a paper sack and he went out.  Both Miles and Avery then went into the postoffice; Miles bought some stamped envelopes, with return cards on them, also some postal cards, and while in the office wrote and mailed a card to witness, J. B. Highfill, at Lone Oak (properly identified and produced in evidence).  Witness noticed his crippled hand.  Avery asked witness about some people he knew in Fort Scott.

Sometime after dark they left Arcadia together in the cart going in the direction of Leroy, in the northwest part of Barton county, Missouri, some four or five miles southeast of Arcadia.  At about nine o'clock that same night they were seen together with the horse and cart in Leroy, attempting to read a sign board by lighted matches.  Witness, Robert Johnson, came by with a lantern and held it up for them to read by.  While there witness had a conversation with Avery, in which Avery showed him his pistol, and while talking to him held the lantern so that it shown directly in his face, and positively identifies defendant as the man.  They then inquired the way to Liberal, some ten miles south in Barton county.  Witness told them of two roads—one the main traveled road, another a little

nearer, but a rough, dim road, leading through a creek bottom not much traveled. They rode off together south, saying they would drive on a-ways and let their horse rest and feed. This was about half past nine P. M. They drove on about three miles south of Leroy to the creek, stopped in some timber, fed the horse some hay taken from a stack near, ate some crackers, made pillows of hay and lay down side by side near the road.

About sunrise the next morning, Wednesday, September twenty-third, some teamsters driving by discovered Miles' dead body by the roadside, "Just the same as if he had been asleep; the arm that had the hand on (the right) was pretty well over his breast, and the other hand was further up, just the same as if he had been sound asleep there." His eyes and mouth were closed; head lying on a bunch of hay, no evidence of any struggle; a bullet wound in the right temple, fracturing the skull on opposite side of head, but not passing through; weapon fired at close range, the hair and skin powder-burned. There were found near and on the body the sample picture, a hat, some letters from General Agent Lively, addressed to Miles, the Arcadia envelopes, etc., etc. The horse, harness, cart, valise, pistol and hat, belonging to the dead man were gone, the horse's tracks going south. An inquest was held over the body before moving, and evidences and property preserved, and the body buried by the coroner in Liberal cemetery, and on Sunday following, September twenty-seventh, the body was exhumed and identified by his father, Richard Miles, as that of his son, James A. Miles.

About three-fourths of a mile south of where the body was found is a pocket lane running east from main road some eighty rods to a house, and is there fenced across. About midnight, September twenty-

second, a man with horse and cart, coming from the north (direction of the body) turned into this lane, went east to the fence at end of lane, turned round, came back west to mouth of lane, and there turned south. The color of this horse tallied with the ·dead man's. The defendant traveled in a road cart drawn by a single horse that night through Minden, in southwest portion of Barton county, and from there to Pittsburg, Kansas. Between two and three o'clock in the afternoon of September twenty-third, defendant was met on the military road about seven miles northeast of Baxter Springs, Kansas, driving south with a horse and cart, suiting the description of the dead man's, witness also driving horse and cart, going north. When defendant drove up, he spoke to witness familiarly, saying, "Hello there, old boy." Said he had seen witness at reunion in Baxter. Traded carts with witness, the witness giving him an old cart and seventy-five cents and a whip "to boot." (This cart, which was still in witness' possession at the time of trial, exactly suited description of dead man's, including the letter "A" cut in bottom of seat.) Defendant proposed to trade horses also, which witness refused to do—defendant then driving off south in the direction of Baxter.

About 5 o'clock P. M. of the same day (Wednesday, September twenty-third) defendant, with horse and cart (horse suiting description of Miles') drove up to witness' restaurant in Baxter Springs, being the first business house going in from the north, went in and called for a lunch. When he drove up he got out and turned horse loose. Witness said: "Here, you had better hitch your horse or he will go off." Defendant said: "No, he wont go off; I have drove him all the way from Fort Scott without anything to eat." Defendant ate lunch, took horse and put up at feed stable, and

went back to restaurant.  Witness' son, Tom Powell, was there, and defendant traded him a pistol for an old Waterbury watch, giving forty-five cents to boot.  The pistol was produced in evidence and identified as Miles' pistol.  These witnesses had seen defendant around Baxter before and knew him by sight and the latter by name.

Defendant remained in Baxter that night, sleeping in the livery stable where the horse was put up. Description of horse as given by liveryman suited that of Miles', the cart old and "rickety."  Defendant had valise on cart; tried to sell witness the horse.  Witness had a cart similar in description to one owned by Miles. Defendant said, "I had a cart just like that one; I traded it off up here and got $1 to boot."  He also told witness about trading pistol for watch, and showed him watch; also, that he had driven from up about Fort Scott that day.  Defendant left stable with horse and cart about eight o'clock next morning (Thursday, September twenty-four), saying he was going to Galena (about eight or nine miles northeast of Baxter).

About ten o'clock that morning defendant drove into Galena with horse, cart and valise  (Horse suits exact  description  of  Miles'  horse)—an old cart; applied to witness James Watson for work in a shaft. Said he had come from Baxter that day.  Witness examined the horse, cart, harness and valise.  Had known  Avery  before,  defendant  having worked for him.   Witness told him he could have work and he put  horse in witness' barn.  Soon after  arriving in Galena,  and  same  day, he was arrested by N. F. Loomis, constable, locked up for about four hours and discharged.  This witness had known  him for two or three years, and it seems, arrested  him on suspicion of having stolen the horse.  Defendant  went to work for witness Watson in the mines the next morning (Friday,

September twenty-fifth) after arriving in Galena, and continued to work for him and board with him until the day before his arrest for murder. This witness made particular examination of all the property Avery brought there, including contents of valise, for the reason that he suspected that it was stolen property. While at this place he gave witness' boy the Waterbury watch he traded Miles' pistol for, produced in court and identified by witnesses. He cut the valise to get the clothes out, saying he had lost the key. Valise was produced in court and identified by witnesses. He traded the horse and harness off for an old watch and $10. Defendant said he thought the watch worth about $8. The harness and this watch produced in evidence and properly identified. Defendant told witness he got horse and cart of a man in Fort Scott—a coal stripper. That he had owned the horse for two months.

On Friday, October 2, 1891, defendant was arrested in Galena, Kansas, for the murder of Miles, having on at the time of his arrest the murdered man's coat, pants and hat, all properly identified and introduced in evidence, the hat having inside the initials "J. A. M."

This closed the state's case-in-chief.

Defendant sworn in his own behalf, testified as follows:

"Q. Your name is Amos Avery? A. Yes, sir.

"Q. How old are you? A. Nineteen last April.

"Q. Was you out there on the creek at the time the young man was killed that the witnesses have been telling about here in court. A. Yes, sir.

"Q. Where was it? A. Well, it was over here on the creek; don't know the country, and I can't say just where it was.

"Q. Who killed that man? A. He killed himself.

"*Q.* What did you do after you got there at the creek? *A.* Me and him unhitched the horse and took him down to water, brought him back and tied him to a tree and fed him some hay.

"*Q.* Who fed him some hay? *A.* I did.

"*Q.* After you fed the horse some hay what did you do? *A.* I laid some hay down to lay on.

"*Q.* Then what did you do? *A.* Well, we laid down there, and after we laid down the man turned over two or three times, and I had my back to him, and I heard a pistol snap, and I raised up to see what was the matter and he said "give me your pistol," and I handed it to him.

"*Q.* Then what? *A.* Well, he shot himself then.

"*Q.* Then what did you do? *A.* I was scared, and I jumped up and run to the horse and untied him and hitched him up and jumped in the cart and went away from there."

Defendant on his cross-examination, among other things, testified as follows:

"*Q.* How long did it take you to hitch up? *A.* Not long.

"*Q.* You did it as quickly as you possibly could? *A.* Yes, sir.

"*Q.* You didn't want to see how badly he had hurt himself? *A.* No sir, I didn't wait.

"*Q.* You didn't wait to see where he had shot himself? *A.* No, sir.

"*Q.* How did you know that he had shot himself? *A.* I knew it by the way he fell and he groaned.

"*Q.* How many times did he groan? *A.* I only heard him groan once.

"*Q.* You didn't wait to see where he shot himself? *A.* No, sir.

"*Q.* Or whether it was a bad wound or not? *A.* No, sir.

"*Q.* You didn't try to find out where he was shot? *A.* No, sir; I was too badly scared to know anything then.

"*Q.* Did you say anything to him? *A.* No, sir; I didn't say a word to him.

"*Q.* The last words you spoke to him was when you said, 'it is under my head?' *A.* Yes, sir; that is the last words I said to him.

"*Q.* And the last words he said to you? *A.* Yes; he asked me where my revolver was, and I told him under my head, and he said 'give it to me.'

"*Q.* Do you remember whether the moon was up when you started away? *A.* No, sir; I don't.

"*Q.* You don't remember whether it was or not? *A.* No, sir.

"*Q.* Did you notice whether the moon was up at all that night? (Objected to by counsel for defendant as immaterial. Overruled by the court. To which ruling defendant by his counsel then and there duly excepted at the time.) *A.* No, sir.

"*Q.* Do you know W. T. Craycroft? *A.* I know him by seeing him here on the stand. .

"*Q.* You know who I mean? *A.* Yes sir.

"*Q.* Did you ever tell anybody prior to the beginning of this trial that you were there with that man that night? (Objected to by counsel as incompetent and immaterial, and because it is not a matter inquired about on the direct examination. Overruled by the court. To which ruling defendant by his counsel then and there duly excepted at the time.) *A.* I told Mr. Craycroft.

"*Q.* That you were there with that man that night? (No answer.)

"*Q.* When did you tell Mr. Craycroft that you were there with that man that night? *A.* When I was in McClure's office.

"*Q.* That statement was read over to you, wasn't it? *A.* I don't remember whether it was or not.

"*Q.* Did you tell Mr. Craycroft then that that man killed himself? (Objected to by counsel for defendant.)

"*Q.* Did you ever tell anybody before this trial began that you were with that man there that night, and that he killed himself? (Objected to by counsel for defendant because it is immaterial and incompetent, and not a proper matter of inquiry of this witness, it not being a matter we have inquired about. Overruled by the court; to which ruling the defendant, by his counsel, then and there duly excepted at the time.) *A.* I don't remember telling anybody but Mr. Craycroft.

"*Q.* Did you tell Mr. Craycroft that that man killed himself there? (Objected to by defendant's counsel same as before. Mr. Craycroft has been produced as a witness and has testified, and, if the gentlemen are not willing to accept it, they ought not to try to impeach him; and we object for the same reason as before stated. Overruled by the court; to which ruling the defendant, by his counsel, then and there duly excepted at the time.)

"*Q.* Did you tell Mr. Craycroft that that man killed himself? *A.* I think I did.

"*Q.* You think Mr. Craycroft is the only person prior to the beginning of this trial that you ever did tell that the man killed himself. *A.* Yes, sir.

"*Q.* Do you say that you told Mr. Croycroft at the time that he was talking to you in McClure's office that the man killed himself? *A.* I think I did; I am not certain about it.

"*Q.* If you didn't tell Mr. Craycroft in that conversation that the man killed himself, then you never did tell anybody that he killed himself? *A.* No, sir; if I didn't tell him, I didn't tell anybody.

"*Q.* Didn't you tell Mr. Craycroft in that conversation that you got that horse and cart from a man by the name of Lon Wright in Fort Scott? *A.* Yes, sir; I did.

"*Q.* This man that you were talking about having killed himself there was the man who had a crippled hand? *A.* Yes, sir.

"*Q.* Do you know what the name of the man was who killed himself in your presence? *A.* I think he said his name was Miles.

"*Q.* Did you tell Mr. Craycroft, in the conversation to which you have been referring, that there was a man with you part of the way, by the name of Thompson? (Objected to by counsel for defendant, same as before, not being a matter inquired about on direct examination. Overruled by the court. To which ruling the defendant, by his counsel, then and there duly excepted at the time.) *A.* Yes, sir.

"*Q.* Didn't you know when you told Mr. Craycroft that his name was Tom Thompson, that his name was Miles? *A.* I didn't remember his name just at the time.

"*Q.* And is this the reason you gave the name of Thompson, because that you forgot that it was Miles? *A.* I don't know that that is exactly the reason that I gave the name.

"*Q.* What is the reason that you gave the name of Thompson? (Objected to by the defendant's counsel, same as before. Overruled by the court. To which ruling defendant, by his counsel, then and there duly excepted at the time.)

"*Q.* What is the reason that you gave the name of the man as Tom Thompson? (Objected to by defendant's counsel, same as before. Overruled by the court. To which ruling the defendant, by his counsel, then and there duly accepted at the time.) *A.* Because I

didn't know the other man's name; I couldn't remember it at the time.

"*Q.* Do you mean by that that you did know the name was Miles, but had forgotten it at the time? *A.* I knew his name when I heard it called, but that is the only way I did know it.

"*Q.* The dead man told you his name was Miles, did he? *A.* Yes, sir.

"*Q.* In that same conversation, didn't Mr. Craycroft ask you if you knew a man by the name of J. A. Miles? *A.* I don't remember whether he did or not.

"*Q.* Didn't you, in that conversation—(By Mr. Cole, for defendant: This question that has been asked and the answer made to it, we ask the court to exclude, for the reason that it was improper cross-examination. Overruled by the court. To which ruling defendant, by his counsel, then and there excepted at the time.)

"*Q.* Did you not, in that same conversation, say to Mr. Craycroft, 'I never saw or heard of a man by the name of J. A. Miles, that I know of,' or words to that effect? *A.* No, sir; I don't think I did.

"*Q.* You stated in your direct examination that you got up as quick as you could, and took the things that were there and went away; what did you take? *A.* I took the horse and cart and pistols.

"*Q.* Did you take the valise. *A.* That was on the cart.

"*Q.* Well, you took it? *A.* Yes, sir; I took that with the cart.

"*Q.* Where did you put your hat when you laid down? *A.* We put our hats together.

"*Q.* Where were they, relative to the place where you laid down? *A.* Right by the tree at our heads.

"*Q.* How far from your heads? *A.* Well, they wasn't over two feet, I don't think.

"*Q.* You took his hat instead of yours, by mistake, when you went away? *A.* Yes, I guess I got his hat by mistake; I grabbed for a hat, and didn't pay any attention to what one I got.

A paper was here shown to witness.

"*Q.* Look at this paper; I will ask you whether or not this is your handwriting? *A.* It is. (By Mr. Cole: We move that the question and answer be struck out. Sustained; and the question and answer excluded.)

Defendant's attorney then introduced witness E. H. Adams, who testified that he had tried an experiment with a thirty-two caliber revolver on a piece of green, damp cowhide, and it scorched the hair when the muzzle held at a distance of one inch, and did not at a greater distance, but don't know anything about its effect on a human head. The experiment was then made on dry, cured hide, with result that it did not burn at a distance of an inch.

Defendant here rested his case.

The state then introduced in evidence a certified copy of the record of a plea of guilty in the district court of Cherokee county, Kansas, and of the judgment and sentence of the court in case of state of Kansas against Amos Avery and Claud Avery.

Excepted to by defendant, but not called for in bill of exceptions of defendant.

This was all the evidence offered.

The following instructions were given for the state:

"1. The court instructs the jury that the defendant is presumed to be innocent of the offense charged; before you can convict him the state must overcome that presumption by proving him guilty beyond a reasonable doubt. If you have a reasonable doubt of defendant's guilt you must acquit him. But a doubt to authorize an acquittal must be a substantial doubt,

founded on the evidence, and not a mere possibility of innocence.

"2. The jury are the sole judges of the credibility of the witnesses, and of weight to be given to their testimony. In determining such credibility and weight you should take into consideration the character of the witness, his or her manner on the stand, his or her interest, if any, in the result of the trial, his or her relations to or feelings toward the defendant or the deceased, the probability or improbability of his or her statements, as well as all the facts and circumstances given in evidence.

"3. If you shall believe from the evidence beyond a reasonable doubt that the defendant on or about the twenty-second day of September, 1891, at the county of Barton, in the state of Missouri, wilfully, deliberately, premeditatedly and of his malice aforethought, shot and killed one James A. Miles you will find him guilty of murder in the first degree.

"4. If you shall believe from the evidence that on or about the twenty-second day of September, 1891, at the county of Barton, in the state of Missouri, the defendant shot and killed James A. Miles for the purpose of robbing him of his property, then such shooting and killing was done wilfully, deliberately, premeditatedly and of his malice aforethought, and you should find him guilty of murder in the first degree.

"5. Evidence is of two kinds, direct and circumstantial. Direct is where a witness testifies directly of his own knowledge of the main fact or facts to be proven. Circumstantial evidence is the proof of certain facts and circumstances in a given case, from which the jury may infer other connected facts which usually and reasonably follow according to the common experience of mankind. Crime may be proven by circumstantial evidence as well as by the direct testimony of

eye-witnesses, but the facts and circumstances in evidence should be consistent with each other and with the guilt of defendant and insconsistent with any reasonable theory of defendant's innocence. If therefore you believe from the evidence that such facts and circumstances have been proven as to satisfy you beyond a reasonable doubt that the defendant, on or about the twenty-second day of September, 1891, at the county of Barton, in the state of Missouri, did wilfully, deliberately, premeditatedly and of his malice aforethought shoot and kill James A. Miles, you are warranted in finding him guilty of murder in the first degree, though no witness has testified of his own knowledge as to the actual fact of such shooting and killing.

"6. As used in the indictment, and in these instructions, the terms wilfully, deliberately, premeditatedly and malice aforethought are defined as follows: Wilfully means intentionally, not accidentally. In the absence of qualifying facts or circumstances, the law presumes that a person intends the ordinary and probable result of his acts and conduct. Deliberately means in a cool state of the blood. It does not mean brooded over or reflected upon for a week, a day or an hour, but it means an intent to kill, executed by the defendant, in a cool state of blood, in the furtherance of a formed design to gratify a feeling of revenge or to accomplish some other unlawful purpose, and not under the influence of a violent passion suddenly aroused by some provocation. Premeditatedly means thought of beforehand, for any length of time, however short. Malice does not mean mere spite, ill will or dislike, as it is ordinarily understood; but it means that condition of the mind which prompts one person to take the life of another without just cause or provocation, and it signifies a state of disposition which shows a heart regardless of social duty and fatally bent on mischief.

Malice aforethought means that the act was done with malice and premeditation.

"7. In case you shall find the defendant guilty of murder in the first degree you will simply so say in your verdict. In such case you have nothing to do with assessing his punishment."

To the giving of such instructions the defendant by his counsel then and there duly excepted at the time.

At the instance and request of the counsel for defendant, the court instructed the jury as follows:

"1. The jury are instructed that the probability of defendant's guilt, as charged in the indictment, is not sufficient to warrant a conviction, nor is it sufficient that the greater weight or preponderance of the evidence supports the allegation of the indictment; nor is it sufficient that, upon the doctrine of chance, it is more probable that the defendant is guilty. To warrant a conviction of the defendant, he must be proved to be guilty so clearly and conclusively that there is no reasonable theory upon which he can be innocent when all the evidence in the case is considered together.

"2. The court instructs the jury that they have no right to disregard the testimony of the defendant on the ground alone that he is the defendant, and stands charged with the commission of a crime. The law presumes the defendant innocent until he is proved guilty, and the law allows him to testify in his own behalf, and the jury should fairly and impartially consider his testimony, together with all the other evidence in the case; and if from all the evidence the jury have any reasonable doubt as to defendant's guilt, they should give the defendant the benefit of the doubt and acquit him.

"3. The jury are instructed that, where a conviction for a criminal offense is sought upon circumstantial evidence alone, the state must not only show by a preponderance of the evidence that the alleged facts and circumstances are true, but they must be such facts and circumstances as are incompatible, upon any reasonable hypothesis, with the innocence of the accused, and incapable of explanation upon any reasonable hypothesis other than the guilt of the defendant; and in this case, if all the facts and circumstances relied on by the state to secure the conviction can be reasonably accounted for upon any theory consistent with the innocence of the defendant, then the jury should acquit him.

"4. If the jury, upon considering all the evidence in this case, believe that James A. Miles came to his death from a pistol shot inflicted upon himself by his own hand, they will acquit the defendant; and if the jury shall, upon consideration of all the evidence, have a reasonable doubt as to whether said James A. Miles died from the effects of a wound inflicted by his own hand, it is the jury's duty to find the defendant not guilty."

The counsel for the defendant requested the court to further instruct the jury as follows:

"5. The court instructs the jury that if they believe from the evidence that the deceased, James A. Miles, came to his death by suicide or self-murder, and that the defendant Amos Avery was present, deliberately aiding and abetting, counselling, advising or assisting in the commission of self-murder or suicide, they will find the defendant guilty of manslaughter in the first degree, and assess his punishment at imprisonment in the penitentiary for a term of not less than five years."

Vol. 113—32

Which was refused by the court; to which refusal the defendant by his counsel then and there duly excepted at the time.

After hearing the instructions of the court and the arguments of counsel, the jury retired, and after due deliberation, returned into court the following verdict, to-wit:

"We the jury find the defendant Amos Avery guilty of murder in the first degree, as charged in the indictment."

Appellant in due time filed his motion for a new trial and in arrest, assigning many causes therefor, notably the action of the court in admitting illegal and improper evidence against his objections; the improper cross-examination of the appellant; giving and refusing instructions; improper remarks made by the prosecuting attorney in his speech, and separation of the jury. The motions were overruled, and he brings the case to this court by appeal.

The errors assigned are the same as in the motion for a new trial. The first point made by counsel in their brief, in that the court committed error in permitting the cross-examination of defendant in regard to matters that he had not been examined with reference to in his examination in chief.

The defendant in his examination testified that he and the deceased went together to the creek where the dead body was found, and that after taking care of the horse, they laid down on some hay, and that the deceased afterwards asked him for his, defendant's, pistol, which he gave to him and with which he shot himself, in other words committed suicide. We take it, that it was entirely proper for the prosecution to ask him on cross-examination whether the moon was shining that night or not, in order that the jury might know his opportunities and facilities for observing the

acts and movements of deceased, and the surround-
ings and circumstances in order the better to determine
whether defendant's statement as to how he came to
his death were true or false, and to that end the ques-
tion was legitimate.

The questions asked by the defendant in regard to
statements made to Craycroft as to how deceased came
to his death, were, if at all material, not prejudicial to
defendant, as his answers thereto were confirmatory of
his statements in chief as to how the deceased did come
to his death.   There was no pretense that his answers
to these questions were not true, and Craycroft was not
put on the witness stand to contradict them.   How
then could defendant's case have been prejudiced
thereby?   He had stated as a witness that he was with
deceased that night, and that he shot himself.   But we
do not think these statements material and can see no
importance to be attached to them; they certainly had
no effect whatever on the jury in their deliberations,
and their admission is no ground for reversing the
judgment.   State v. Brooks, 92 Mo. 582; State v.
Beaucleigh, 92 Mo. 495; State v. Douglass, 81 Mo. 235.

The defendant was also asked on cross-examina-
tion if he had not told Craycroft that a man was with
him a part of the way by the name of Thompson,
and that he gave the name of Thompson, because
he could not remember at that time that it was
Miles?   This was also objected to by defendant's coun-
sel, and the question allowed to be answered.
Craycroft had testified in the case as a witness for the
state, that he heard defendant say that he traveled a
portion of the distance with a man by the name of
Thompson, and that Thompson left him a short dis-
tance this side of Arcadia.   "I think he said about two
and a quarter miles, and that just before Thompson
left him, he saw a man and asked him the road to

Galena." The cross-examination of defendant in regard to this matter was proper for the purpose of showing that the man Thompson was no other person than the deceased, whom defendant had testified killed himself, and came within the express provisions of the statute (Revised Statutes, 1889, sec. 4218), confining the cross-examination in cases of this kind to the examination in chief. It was also competent for the purpose of laying the foundation to contradict him. *State v. McGraw*, 74 Mo. 573; *State v. Palmer*, 88 Mo. 568; *State v. Grant*, 79 Mo. 113; *State v. Clinton*, 67 Mo. 380; *State v. Bulla*, 89 Mo. 595.

In the case of the *State v. West*, 95 Mo. 140, the defendant on cross-examination was asked if he did not state to Si Finley that day, the day of the homicide, that he had the same right to kill a man who was trying to steal his land, as he would if he was trying to steal his horse? And, although the defendant had not testified to any conversation with or statements made to Finley in his examination in chief, this court ruled that the question was a proper one, and that the court did not commit error in permitting it to be answered. *State v. Brooks*, 92 Mo. 542; 1 Greenleaf on Evidence, sec. 462.

We think, as was held in the case of *People v. Mullings*, 83 Cal. 138, where the defendant was put upon trial for murder and asked but this one question: "Did you or did you not, kill John Moore," and he answered no, the court, under a statute almost exactly like the Missouri statute, ruled that because of the general nature of the defendant's statement, a wide range of cross-examination should be allowed.

In the case of *Gale v. People*, 26 Mich. 158, and all of the other cases cited by appellant, the cross-examination was in regard to other crimes committed by the party on trial in regard to which he had said

nothing as a witness, or were entirely foreign to the examination in chief, and was not permissible on that ground.

Objection is made to instruction number 4, given on behalf of the state, because it is contended that it assumes that there was evidence that James A. Miles was shot and killed for the purpose of robbing him of his property. We do not think that it is susceptible of such a construction; upon the contrary, that it is in exact harmony with the law as declared by this court in the case of *State v. Hopkirk*, 84 Mo. 287, and the authorities therein cited; *State v. Meyers*, 99 Mo. 107; *State v. Bulling*, 105 Mo. 204; *State v. Miller*, 100 Mo. 606; Revised Statutes, 1889, sec. 3459.

It is next objected to instruction number 5 given for the state that it does not require the circumstances, from which the jury may infer other connected facts, shall be established beyond a reasonable doubt, and that it is a comment on the evidence. This instruction has been declared to be the law, and has been sanctioned by this court in a large number of cases. *State v. Hill,* 65 Mo. 87; *State v. Brooks,* 92 Mo. 555; and the objection to it is not well taken. *State v. Dickson,* 78 Mo. 441; *State v. Moxley,* 102 Mo. 374.

The seventh instruction given by the court on the part of the state told the jury, that, if they found the defendant guilty, they would simply so say in their verdict, and that they had nothing to do with assessing his punishment. This instruction is also objected to by appellant because unauthorized by law in such cases. In cases of murder in the first degree the punishment is fixed by statute, and the jury trying the case has nothing whatever to do with it, and we see no impropriety in the court so stating in an instruction to them.

The court in the fourth instruction, given on behalf of defendant, told the jury that, if they believed

from the evidence that James A. Miles came to his death by a pistol shot inflicted upon himself by his own hand, or if they had a reasonable doubt in regard thereto, they should find defendant not guilty. This was certainly very favorable to defendant, and covered the same point presented by the fifth instruction asked by him, which was rightfully refused.

The instructions given in the case covered every point in controversy, and were as favorable to defendant as he could expect.

During the progress of the trial, before any evidence was introduced by defendant, and two days before the cause was submitted to the jury, Sunday intervened, and the sheriff permitted the jury to separate in the following manner. Two of the jurors, G. W. Yerger and G. W. Fast, in the charge of a sworn officer, went to their respective homes in the city of Lamar, where the case was being tried, for the purpose of changing their linen, afterwards to attend a call of nature. They were absent and separated from their fellows from twenty to thirty minutes, when they returned to and were locked up with the other jurors composing the panel. At no time were they out of the officer's presence, nor did they speak to or converse with any person during their absence. The other ten were, during this time, kept together by themselves, and also in the charge of an officer. There were counter-affidavits filed by appellant. The separation of the jury would have *prima facie* entitled the appellant to a new trial, and it devolved on the state to show affirmatively that the absent jurors had not been tampered with, or by at least producing evidence which dispelled any probability that such was the case. The circuit judge was satisfied from the testimony of the witnesses that the defendant was in no manner

prejudiced by the separation, and we think the evidence fully justified its ruling.

Appellant's counsel cites many authorities from the best law writers, and decisions from a large number of courts of high authority, which hold that under the facts in this case the verdict of the jury should be set aside because of their separation, but the same subject was recently under review in this court in the case of *State v. Orrick*, 106 Mo. 124, where Judge MACFARLANE, after an able review of all the authorities, held that when the separation occurs after the retirement of the jury, that under sections 1910, 1966, Revised Statutes, 1879, a new trial is mandatory, but that under section 1909, Revised Statutes, 1879, where the separation occurred during the progress of the trial, and before the retirement of the jury for the consideration of the verdict, it will constitute a ground for a new trial, unless it is made affirmatively to appear on the part of the state that the jurors were not subject to improper influences. That case is decisive of this. *State v. Payton*, 90 Mo. 220; *State v. Collins*, 86 Mo. 250.

The certified copies of what purported to be the record of the judgment of a Kansas court, showing that the defendant had been convicted in Cherokee county in that state for burglary and larceny, and sentenced to the penitentiary for two years, was read in evidence over the objection of defendant's counsel, and the ruling of the court assigned as error; but, as the record or certified copies are not made part of nor incorporated in the bill of exceptions, the ruling of the court is not subject to review. The presumption is that this evidence was properly admitted.

An objection is made to some remarks made by the prosecuting attorney during the trial of the cause, but as the bill of exceptions does not show what they were, nor make any reference to them, nor do defend-

ant's counsel in their statement and brief, it is impossible for us to determine what they were and whether improper or not.    We have examined the opening statement of the prosecuting attorney which is copied in the bill, and which shows that defendant objected and excepted to some parts of his statement, but it does not seem to us on a careful examination that there is anything in it to which the most technical objection could be made, or of which the defendant could have any right to complain.

We have examined the entire record in this case, and the authorities cited by the distinguished counsel for appellant, and have been unable to discover any error which would justify us in reversing it.    The case seems to have been well tried, and the verdict of the jury justified by the evidence.    The judgment is affirmed.    All of this division concur.