STATE of Missouri, Respondent,

v.

Fraulein SCOWN, Appellant.

No. 46139.

Supreme Court of Missouri,

Division No. 2.

April 14, 1958.

Rehearing Denied May 12, 1958.

Shaw & Smith, Clayton, for appellant.

John M. Dalton, Atty. Gen., Donal D. Guffey, Asst. Atty. Gen., for respondent.

EAGER, Judge.

Defendant was indicted and convicted upon a charge of abortion under Section 559.100 RSMo 1949, V.A.M.S., and sentenced to a term of three years in the penitentiary. Motion for new trial was duly filed and overruled, and this appeal followed. The case has been fully briefed for the appellant, so we shall confine our consideration to the points raised in that brief. Supreme Court Rules, rule 28.02, 42 V.A.M.S.

The sufficiency of the evidence for submission is not attacked, but its sufficiency to support an instruction is denied; we must therefore state the facts in some detail. The prosecuting witness, Wanda Brown, was married, and had three small children. Her testimony showed, in substance, the facts which are now related. She was "pretty sure" she was pregnant, and took two "shots" from a doctor in an effort to eliminate the condition; she described in some detail the symptoms which had convinced her that she was pregnant. The doctor who gave her the "shots" told her that they had done no good, and gave her a telephone number and the name "Julia" on a slip of paper. After one or more telephone calls it was arranged for her to be at a certain doorway in the Medical Center at Hampton Village at 8:00 p. m. on Saturday evening, April 28, 1956.

She went there and, with three other girls who also came, waited a short time. A little after eight a red-headed woman, whom she definitely identified as the defendant, appeared on the scene, counted them, and escorted them to a blue and white Cadillac car on a near-by parking lot. They all got in and defendant drove away. During the trip the driver took from the glove compartment several pairs of sun glasses with dark paper pasted over the lenses, and had all four girls put them on; she then stated that "the place we were going was her house and she didn't want us to know where it was * * *." She also explained to the group that on that evening "she would open our wombs, it wouldn't hurt and we would be given sleeping pills * * * that Sunday morning * * * our wombs would be scraped and that we would be given gas * * *." After a time the girls were told by the defendant to get down on the floor of the car; three of them did so, and Mrs. Brown lay down on the back seat. The car was driven into a basement garage and the girls, escorted by defendant, all went up and through the kitchen to bedrooms which they occupied during their stay, two to a room; they were told to undress. The witness at this point identified photographs of various parts of the interior of that house, stated also that she had seen the house later in company with two assistant prosecutors, and that it was on Tuxedo in Webster Groves. After locating these girls in their rooms, the "red-head" gave them a talk, and gave each of them a little envelope with some "tablets" in it for use if they "flooded" in the next two months; the witness identified at the trial her own envelope and pills; the girls were then locked in their rooms, and defendant took them, one at a time, to the kitchen. Mrs. Brown had told the defendant after she arrived at this house that she did not have the required $125, but had only $60; defendant was "pretty mad at me," but finally agreed that the witness could take the bal-ance to the doctor who had started her on the expedition. At some time during that evening the witness was taken by defendant to the kitchen, clad only in her gown; she gave defendant her $60, got on the table (which was padded), and placed her feet on the edge of the table "like * * * in stirrups in a doctor's office." A piece of cloth was pinned over her eyes by the defendant; she then felt "something either being inserted or being pulled out of me"; on cross-examination she stated that she felt something either being inserted or pulled out of "my womb or vagina." She had previously placed nothing there. The blindfold was removed and Mrs. Brown was taken to her room by defendant; she "cramped * * * hurt awful through my stomach," not having done so previously; later defendant gave her a sleeping pill. The next morning she was again taken to the kitchen by defendant and got on the table, defendant placing her legs; she was again blindfolded, but before that she saw the door from the basement moving "back and forth" a little; she was given gas and lost consciousness. When she regained consciousness defendant removed the blindfold, no one else was there, and she was again taken to her room, where she dressed. Somewhat later, all four girls went to the basement with defendant and again they were given the dark glasses; they got in the car, distributing themselves on the floor and prone on the back seat as previously. Three of them were taken by defendant to the "Manchester Loop," and one got out on the way. Mrs. Brown had never been advised by any physician to have an abortion and her health was good, both before and after these experiences.

Mrs. Gertrude Knetzger testified that she owned the property at 415 Tuxedo (the location in question) and described it, identifying the various photographs; she further testified that on February 12, 1956, she rented the property to a "Mrs. John Anderson" who came to her home and paid her $75 at that time; she identified "Mrs.

John Anderson" as the defendant. She produced her own copy of the typewritten rent receipt and also testified that she received the rent due on March 11 and April 11 by money order through the mail, and that she gave this lady the keys on February 12.

Police officers of Webster Groves identified the photographs of the interior of the house, and testified: that a car was seen to enter the basement garage at 415 Tuxedo about 8:30 on the evening of April 28, 1956; that a Cadillac car was driven out of that basement after 9:00 the next morning, that they located this car shortly afterward in Maplewood, recognized defendant as the driver and saw three other women in the car; the other women got out at the bus stop at the "City Limits Loop." When defendant was arrested at her home on May 3, they found in a drawer and took, along with various other articles, receipts for gas and water deposits on the premises at 415 Tuxedo, issued to "John Anderson." These were offered and received in evidence. One of these witnesses further testified that defendant was taken to 415 Tuxedo and that she "let us in with a key she had."

Betty Pierce, one of the girls who was with Mrs. Brown throughout the events related, testified for the state, without objection: that she was married and had two small children; that she had also obtained the name "Julia" and the telephone number; that she had called, and after making the necessary arrangements, she went to the doorway in Hampton Village on the evening of April 28, 1956. Three other girls were also there, and soon a "red-headed lady" came and picked them up; that enroute this woman explained that "we would be packed on Saturday night and on Sunday morning we would be given anaesthetic and our wombs would be scraped." Her further testimony, also given without objection, substantially confirmed all the details of Mrs. Brown's testimony up to the point

where she (Betty Pierce) was actually taken into the kitchen. Among other things she thus testified that she paid $125 to the "red-headed lady" as "the fee for the abortion." Over objection, as will be discussed subsequently, this witness testified to substantially the same course of procedure in the kitchen as did Mrs. Brown. During that part of her testimony she stated that the blindfold slipped a little and she saw a "dark-headed lady"; it was fairly indicated that this other woman "packed" her on Saturday evening. Mrs. Pierce recalled Wanda Brown, the prosecuting witness, as one of those who was with her on these two days, and in fact that Mrs. Brown telephoned Mrs. Pierce's husband from the "loop" to come and get her. Mrs. Pierce did not positively identify defendant as the "red-headed woman"; she stated variously that "it could be that lady there,"—"she looks something like her * * * this lady's hair is fixed different * * *," but that the red hair was similar. Certain other phases of the evidence will be referred to hereinafter.

The first and most serious point raised concerns the scope of the cross-examination of the defendant. On direct examination she stated her name, that she had never been convicted of any criminal offense, and that she did not, on the evening of April 28, 1956, at about 8:00 p. m. or on April 29, 1956, perform an abortion upon Wanda Brown. We may state here, that in view of the nature of the testimony and the theory upon which the case was tried, we consider this as equivalent to a denial that she had aided, abetted, or in any way participated in any such abortion. We also note that this denial, in effect, was a general denial of the charge, for these two dates were the only ones upon which the state claimed that criminal acts had been performed. On cross-examination the defendant was asked, and answered over proper objections, the following questions: whether she had ever rented the house at 415 Tuxedo; whether she knew Mrs. Knetzger;

whether she went to Mrs. Knetzger's home in February, 1956; whether she was in the premises at 415 Tuxedo in April, 1956; whether she picked up Wanda Brown about 8:00 p. m. on April 28, 1956, at Hampton Court; on what date she was arrested; whether she knew Julia Rackey (who was indicted as a co-defendant, but from whom a severance was granted); whether she knew Betty Pierce; whether she had seen the things portrayed in the state's photographs of the interior of the house in question; whether she had paid rent for use of the house at 415 Tuxedo; who paid the rent on it for April, 1956, and for two months previous; whether she had ever seen the receipts for gas and water deposits on 415 Tuxedo; and, why she had the keys to the house in her possession. It will not be necessary to relate in detail defendant's answers to all these questions; suffice it to say, generally, that she testified: that she did not rent the house, that she had met Mrs. Knetzger but never went to her home, that she had been in the house in question during April, 1956, that she did not pick up Wanda Brown, that she had met Mrs. Rackey, that she did not know Betty Pierce, that she had seen the interior of this house, that she did not pay rent on the house and had no idea who paid it, or "out of whose pocket the money came"; that she was not "too sure" whether she had seen the deposit receipts before the trial, but that she did not "take them out," and that the keys "were sent to me."

In the early legal history of Missouri, as elsewhere, a defendant in a criminal case was not competent to testify. State v. Larkin, 250 Mo. 218, 157 S.W. 600, 46 L.R.A.,N.S., 13; State v. Clinton, 67 Mo. 380, 390. The rule was wholly illogical and it was abolished in Missouri by statute in 1877 (Laws 1877, p. 356). Under this first statute it was held (Clinton, supra; State v. King, 342 Mo. 1067, 119 S.W.2d 322, 329) that the defendant, having thus been made competent as a witness in his own behalf, might testify or not at his option, but that when he did testify, he occupied the same

position as any other witness and might be cross-examined on "any matter pertinent to the issue." At the next session of the legislature the substance of our present statute (§ 546.260) was enacted, becoming § 1918, R.S.Mo. 1879. By Art. 1, § 19, Mo.Const., V.A.M.S., a defendant is protected against self incrimination so long as he chooses not to testify. When, at his option, he does testify, he waives his immunity except as that waiver is restricted by our statute, the pertinent part of which is: "* * * and shall be liable to cross-examination, as to any matter referred to in his examination in chief, and may be contradicted and impeached as any other witness in the case; * * *"

■ We do not agree with the statement in State v. Dinkelkamp, Mo., 207 S.W. 770, 772, that the purpose of the statute "is to emphasize the constitutional provision," but our disagreement is perhaps more academic than practical. While our statute attempted to fix the limits of cross-examination and the extent of a defendant's waiver of immunity, neither it nor the many adjudicated cases give us any yardstick by which we can accurately measure the breadth of a cross-examination and tell clearly whether its proper scope has been infringed. It is probably impossible to lay down any definite rule. Each case is very much dependent upon its own facts and background. We note here, however, that it would be useless and confusing to discuss the outstate cases cited by the respondent, or Mr. Wigmore's broad rule (Wigmore on Evi., 3rd Ed., Vol. 8, § 2276) in view of our controlling statute, except, perhaps as they might indicate generally the propriety of a broad construction of the right of cross-examination. State v. Avery, 113 Mo. 475, 21 S.W. 193.

■ In sundry cases our courts have said that the state is not confined to a "categorical review" of the matters covered or stated in the direct examination of a defendant, but that the cross-examination may cover all matters within the fair purview of the

direct examination. State v. Hartwell, Mo., 293 S.W.2d 313, 317, and cases cited; or, as otherwise expressed, the defendant may not take the stand and by confining his answers to "one or two well-prepared interrogatories sweep away the whole structure of the state's case, and then remain immune from a cross-examination on the issue thus tendered." State v. Miller, 190 Mo. 449, 89 S.W. 377, 381, State v. Kaufman, Mo., 254 S.W.2d 640. In State v. Christian, Mo., 245 S.W.2d 895, 899, this court said: " * * * 'The "matter referred to in his examination in chief" means the things he testifies about. * * * If the defendant in chief in a general way refers to a subject, he may be examined in detail as to that subject. Where he states a fact in relation to his actions, the prosecutor may inquire as to particular circumstances which would throw light on that fact.' State v. Ayres, 314 Mo. 574, 285 S.W. 997, 998. * * * " And see also, State v. Dees, Mo., 276 S.W.2d 201, 207; State v. Dill, Mo., 282 S.W.2d 456; 58 Am.Jur., Witnesses, § 651; 98 C.J.S. Witnesses § 395, pp. 174–175. In the Dees case the court said, 276 S.W.2d loc. cit. 207: " * * * He may be cross-examined with reference to any subject matter concerning which he gave testimony. State v. Gilmore, 336 Mo. 784, 81 S.W.2d 431, 432 [2]." And in State v. Kaufman, supra, the court said (254 S.W.2d 640, loc. cit. 641, 642): " * * * in this case, defendants' sweeping denial of the theft was a statement of fact in such a general way as to open for cross-examination in detail the whole subject of whether or not they committed it; * * *"

■ A material distinction must be noted between the facts and evidentiary elements of the present offense and those charged in many of the cases cited. The state's evidence here, if believed at all, showed that the acts charged occurred in the house at 415 Tuxedo in Webster Groves; it also showed that defendant took these girls there, gained entrance and took them in; they saw no one else there at the time. It is perfectly obvious here that if the acts charged were performed, a suitable and secluded place had to be provided by someone. Under these circumstances the right of access to, and control of, the premises became a material fact, so as to make defendant's means and right of access a feature bearing directly upon her opportunity to participate, as well as upon her probable presence. See, for a somewhat analogous situation concerning "access," State v. Smith, 358 Mo. 1, 212 S.W.2d 787, 789. To this extent, at least, the present case differs from many of those cases involving some single specific act such as a homicide, rape or robbery; and this must be taken into account in considering the scope and meaning of a denial, general in effect.

We hold that the questions as to whether defendant rented the place or had paid rent on it, whether she was in the premises during April, 1956, whether she had seen the interior of the house as shown in the photographs, whether she had seen the gas and water receipts, and why she had the keys, were all proper and within the fair scope of the subject matter of defendant's denials. If defendant had wished to foreclose a discussion of these subjects she need not have made, voluntarily, what amounted to a complete and general denial of the state's charges. We do believe that these questions and answers, in their total effect, were prejudicial, but that is immaterial if the questions were proper. See, generally, State v. Kaufman, Mo., 254 S.W.2d 640, 641; State v. Avery, 113 Mo. 475, 21 S.W. 193; State v. Dees, Mo., 276 S.W.2d 201; State v. Drew, Mo., 213 S.W. 106; State v. Tyson, 363 Mo. 1242, 258 S.W.2d 651; State v. Miller, 190 Mo. 449, 463, 89 S.W. 377.

■■ The question as to whether defendant knew Mrs. Julia Rackey was objected to, but upon a subsequent question asking whether defendant was with Mrs. Rackey on April 28, 1956, at defendant's residence, counsel affirmatively stated that he had no objection; nor did he object to a further question asking whether defendant

saw Mrs. Rackey on that evening, to which defendant answered that she did not recall but that she was never in her home with Mrs. Rackey. The only evidence concerning Mrs. Rackey was that her name was listed in the telephone book with the number given to two of these girls. We hold that defendant waived the objection to the original inquiry concerning Mrs. Rackey and that also under the circumstances shown here the matter was not substantially prejudicial. We need not determine the propriety of the questions. Whether the defendant picked up Wanda Brown at the time and place in question, and whether she knew Betty Pierce were matters directly within the subject matter of defendant's denial. The question as to the date of defendant's arrest was perhaps improper, but wholly immaterial; it was asked merely to fix some related date. We think that the question asking who paid the rent on these premises for April, 1956, and for two months prior thereto was improper as assuming that defendant knew or might know that fact but, after full consideration we have determined that this inquiry and defendant's answers were not substantially prejudicial, in view of all the other matters which had properly been covered. We cannot feel that this feature, standing alone, substantially influenced the jury (or the court) in view of the mass of other evidence.

The defendant has cited and relies on the following cases: State v. Dinkelkamp, Mo., 207 S.W. 770; State v. Pfeifer, 267 Mo. 23, 183 S.W. 337, and State v. Nicholson, 337 Mo. 998, 87 S.W.2d 425. In the Dinkelkamp case, involving an abortion, a witness had testified that he gave the defendant $30 for performing the abortion claimed; it was held error to ask defendant, on cross-examination, why she had received that money. We think that the question there was improper in making an assumption, but not merely because it might tend to "corroborate the state's witness," as indicated in the opinion. That case, properly considered, is no authority against our present holding. In the Pfeifer case, a

sodomy prosecution, the court held erroneous two lines of inquiry, out of a total of 46 questions claimed to have been improper, namely: whether defendant knew, and for how long, the men who had performed highly revolting acts with the prosecutrix immediately prior to defendant's alleged appearance and participation; and, what were the defendant's movements and activities (in detail) on the night of, and after, the time of the alleged assault. Much of the discussion of the court there concerned the prejudicial nature of these questions, of which there could be little doubt. It is somewhat difficult for us to follow the apparent ruling that all questions concerning defendant's acquaintance with the other persons involved were improper, since defendant's offense there could not well have been related or described without also bringing the others directly into the picture. See the companion case, State v. Katz, 266 Mo. 493, 181 S.W. 425. But, be that as it may, the Pfeifer case, on its facts, cannot be controlling here. The only remotely similar question in our case concerned defendant's acquaintance with Julia Rackey which was largely immaterial in the light of the evidence. In so far as inquiries about "activities" may here be concerned, the only such inquiries concerned the house in question, defendant's presence there, and picking up Wanda Brown; these were entirely proper. As already pointed out, the right of access to, and control of, the house in question was a material element in the present case and within the subject matter of defendant's denial. In the Nicholson case, supra, the defendant made no general denial of participation or implication in the robbery, and we think that the facts distinguish it from the present case.

 The next point made is that the admission of the testimony of Betty Pierce as to the acts performed upon her was prejudicial error because this was evidence of a "separate and distinct" crime. Generally, of course, evidence of a different crime is inadmissible. State v.

Reese, 364 Mo. 1221, 274 S.W.2d 304; State v. Green, Mo., 236 S.W.2d 298; State v. Shilkett, 356 Mo. 1081, 204 S.W.2d 920, all cited by defendant. But the cases recognize well-defined exceptions to the rule. Thus, in State v. Kornegger, 363 Mo. 968, 255 S.W.2d 765, 768, this court said: "* * * Where the proof of other offenses may tend to establish motive, or intent, or absence of accident or mistake, or identity of the defendant, or a common scheme or plan embracing the commission of separate similar offenses so interrelated to each other that proof of one tends to establish the other, such other offenses are widely held under these circumstances to be admissible in proof. State v. Garrison, 342 Mo. 453, 116 S.W.2d 23, 24. * * *" See also: State v. Saussele, Mo., 265 S.W. 2d 290, quoting the above with approval; State v. Harrison, Mo., 285 S.W. 83, 20 Am.Jur., Evidence, § 310. The theory advanced here by the prosecution (out of the jury's presence) at the time the evidence was admitted was that it tended to show identity and intent. We are not impressed with these theories in this particular case, but if the evidence was generally competent on any theory or for any purpose, the trial court cannot be convicted of reversible error in admitting it. Scott v. Missouri Ins. Co., Banc, Mo., 233 S.W.2d 660, 665; the objecting party may, if he desires, request a limiting instruction. One recognized exception to the general rule excluding evidence of other crimes is that the evidence is admissible when there is a "common scheme or plan embracing the commission of separate similar offenses * * *" (Saussele, supra) [265 S.W.2d 296], the evidence here was admissible on that theory. The state had previously shown, without objection, that defendant had picked up the four girls, including Betty Pierce, had advised all of them of the procedure to be followed, and had made sundry preparations; Betty Pierce had also testified, without objection, that she had paid defendant $125 as "the fee for the abortion." If the state's evidence

is to be believed, as it was, it would be difficult to imagine a more appropriate instance of a "common scheme or plan" than the wholesale abortion project shown here. We hold that the connection was such that evidence of an abortion upon Betty Pierce tended directly to prove the abortion on Wanda Brown, pursuant to the general scheme. See, generally, on the admissibility of evidence of other abortions: Biegun v. State, 206 Ga. 618, 58 S.E.2d 149; Smith v. State, 83 Okl.Cr. 209, 175 P.2d 348; 15 A.L.R.2d 1080, 1099, note. Moreover, evidence of the procedure used upon Betty Pierce could not have added anything substantially prejudicial to the evidence already admitted without objection. Counsel also urge that evidence to sustain a common plan or scheme was inadmissible because no such scheme was charged in the indictment, and defendant had no notice. They cite no authority for this contention. It has been held that it is not necessary to allege a plan or conspiracy in order to establish it by evidence, for the plan or conspiracy is merely evidentiary and is not the crime actually charged. State v. Kolafa, 291 Mo. 340, 236 S.W. 302; State v. Adams, 355 Mo. 1186, 200 S.W.2d 75; State v. Pope, 338 Mo. 919, 92 S.W.2d 904. As a separate point counsel also insist that if Betty Pierce's evidence was admissible at all it would only have been admissible in rebuttal, and when and if defendant's denials were broad enough to justify it, or her character was put in issue. Counsel cite only State v. King, 342 Mo. 975, 119 S.W.2d 277; there the evidence of other similar but wholly independent sex crimes was being discussed as creating an "antecedent probability," of guilt, somewhat as the converse of evidence of good character; the court there held that, on that basis, the evidence must come in rebuttal. The situation here is vitally different, for evidence of the operations upon the two girls in the present case, performed at substantially the same time and pursuant to a common scheme, comes within a recognized exception to the gen-

eral rule of exclusion (apparently not true in the King case) so that proof of one tends directly to prove the other, and the evidence becomes independently admissible. We disallow the point. The "common scheme and plan" cases do not seem to make any such distinction as counsel now claim.

■ The jury in this case, after deliberating for several hours, agreed upon a verdict of guilty but was unable to agree on the punishment. The court under authority of section 546.440 assessed the punishment at three years in the penitentiary. The crime is one often described as a "mixed felony," that is, one punishable by fine, jail sentence, or confinement in the penitentiary. Section 559.100. Three years is the minimum penitentiary sentence prescribed by the statute, and five years the maximum. Counsel insist that the punishment assessed was so harsh and arbitrary that defendant was thereby deprived of a "fair trial." They rely strongly upon statements of the court that the defendant was entitled to no leniency, since the matter did not arise upon a "plea," but after a trial, difficult for all, had been had. It is urged that the court thus penalized defendant for exercising her inherent right to a trial. This matter requires no extended discussion; unless we can say that the court abused its discretion and acted capriciously and arbitrarily, we may not reverse the case on this ground. Counsel argue certain matters which go primarily to the weight of the state's evidence; these are now immaterial; the jury has found the defendant guilty, and we cannot say that the court failed to consider all the evidence. The only case cited is State v. Burton, 355 Mo. 792, 198 S.W.2d 19, where the court assessed a punishment of 25 years for statutory rape; that case merely affirms the rule that the sentence will not be set aside except for an abuse of discretion, generally to be shown by some evidence of partiality, prejudice, oppression or corruption. The trial court there stated that it was not precluded from considering the previous record of the defendant, and this court said that "evidently the judge did consider" it, although such was not in evidence. Apparently counsel argue here that defendant's prior good record should have been considered; we cannot say that it was not. The punishment here was the minimum penitentiary sentence and we are wholly unable to find any such abuse of discretion as the cases indicate to be necessary. The failure to extend leniency under this evidence does not constitute a showing of prejudice or oppression.

■ The last point made is that the State's Instruction No. 2 was not supported by the evidence. It required a finding that defendant, "acting alone or with another or others * * *, did * * * use and employ in and upon the body and womb of said Wanda Brown, a certain instrument or instruments and thrust and force such instrument or instruments into the private parts and womb of Wanda Brown * * *." In substance counsel say that there was no evidence of such use of an "instrument or instruments" upon the parts named. The evidence which we have recited at some length largely answers this contention. It is common knowledge that pregnancy occurs in the uterus or womb. Wanda Brown saw no "instrument," for she was blindfolded; she was told by defendant, in advance, that "she would open our wombs" that night, and that on Sunday morning "our wombs would be scraped." On Saturday night she felt something "either being inserted or pulled out of me"; and on cross-examination she further said (which counsel omit) that this was "being inserted or being pulled out of my womb or vagina." The first operation was followed by severe cramps. On Sunday morning Mrs. Brown was under an anaesthetic. The word "instrument" is a broad term, but we need not quibble over its definition or meaning. The evidence here was ample to create a fair inference that an "instrument" was used upon the girl's "body and womb"; the giving of the instruction was not error.

The formal parts of the record are sufficient; no reversible error has been found and the judgment and sentence are affirmed.

STORCKMAN, P. J., and ELMO B. HUNTER, Special Judge, concur.

LEEDY, J., not sitting.